UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

DAVID M GREEN, §
§
      Plaintiff, §
§
VS. §    CIVIL ACTION NO. 7:18-CV-49
§
CITY OF MISSION, *et al*, §
§
      Defendants. §

## <u>OPINION AND ORDER</u>

Before the Court is the motion for summary judgment[1] filed by Javier Lara ("Lara") and Sean De La Rosa ("De La Rosa") (collectively "Defendants"), the response filed by David M. Green ("Plaintiff"),[2] as well as the reply filed by Defendants.[3] Also before the Court is Plaintiff's "Opposed Motion for Leave to File Sur-Reply Opposing Defendants' Motion for Summary Judgment."[4] Finally, the Court also considers Plaintiff's "Motion to Partially Strike Albert Rodriguez's Proposed Testimony"[5] and Defendants' response.[6]

After considering the motions, the relevant authorities, and the record, the Court **GRANTS IN PART AND DENIES IN PART** Plaintiff's motion to strike, **GRANTS** Plaintiff's motion to file a sur-reply, and **GRANTS** Defendants' motion for summary judgment.

### I.    BACKGROUND

This summary judgment motion concerns an excessive force case involving the fatal shooting of Plaintiff's son, David M. Green II ("Decedent"). In sum, Plaintiff alleges that

---

[1] Dkt. No. 24.
[2] Dkt. No. 29.
[3] Dkt. No. 31.
[4] Dkt. No. 32.
[5] Dkt. No. 27.
[6] Dkt. No. 28.

Decedent, while suffering from mental illness, attempted to evade police by fleeing in Plaintiff's pick-up truck and a high-speed chase ensued, resulting in Decedent crashing into a tree.[7] Plaintiff further alleges that after the accident, officers from the Mission Police Department shot Decedent while Decedent was still in the truck.[8] On this basis, Plaintiff brought claims against three of the police officers involved in the shooting: Officer Jorge Cabrera ("Cabrera"), Officer Javier Lara ("Lara"), and Officer Sean De La Rosa ("De La Rosa"), as well as claims against the City of Mission.[9]

Given the detailed nature of the facts and the contested nature of some of the evidence, the Court will briefly lay out the case's current procedural posture, then move to resolving any evidentiary issues, before providing a more detailed factual background.

### a. Procedural Background

Plaintiff filed his original complaint in February 2018,[10] and thereafter filed an amended complaint as a matter of course.[11] The amended complaint alleged claims under 42 U.S.C. §1983 against Cabrera, Lara, and De La Rosa in their individual capacities, as well as claims against the City of Mission.[12] Plaintiff also brought claims under Title II of the Americans with Disabilities Act and Texas Tort Claims Act against the City of Mission.[13]

Subsequently, Defendants, including the City of Mission and Cabrera, filed a motion to dismiss all Plaintiff's claim.[14] This Court granted Defendants' motion in part and dismissed all

---

[7] Dkt. No. 7 pp. 3–7, ¶¶ 10–24.
[8] Id.
[9] Id. pp. 7–8.
[10] Dkt. No. 1.
[11] Dkt. No. 7. The summons for all Defendants were issued February 23, 2018. Plaintiff's first amended complaint was filed exactly twenty-one days later—March 16, 2018, and is thus valid as a matter of course.
[12] Id. pp. 7–8.
[13] Id.
[14] Dkt. No. 8.

Plaintiff's claims, except Plaintiff's claims against Defendants Lara and De La Rosa for excessive force in violation of the Fourth Amendment.[15]

This Court entered a scheduling order.[16] Defendants timely filed the instant motion for summary judgment pursuant to Federal Rule of Civil Procedure ("Rule") 56 on the grounds that Lara and De La Rosa are entitled to qualified immunity.[17] Plaintiff responded.[18] Defendants filed a reply.[19] Subsequently, Plaintiff filed a motion for leave to file a sur-reply,[20] and a proposed sur-reply.[21] In addition, Plaintiff also filed a motion[22] to partially strike the testimony of Albert Rodriguez, and Defendants replied.[23] The Court now turns to its analysis.

## II.    MOTION TO STRIKE

Because Plaintiff's motion to strike[24] the testimony[25] of Albert Rodriguez ("Rodriguez") impacts the evidence to be considered in Defendant's motion for summary judgment, the Court considers this motion first. In consideration of Plaintiff's motion to strike, the Court notes that it is not the trier of fact in the summary judgment context. Thus, Plaintiff's requests are somewhat off the mark. Nonetheless, the Court addresses each request, but its rulings apply only in the summary judgment context.

---

[15] Dkt. No. 16. The Court notes that due to a scrivener's error, the conclusion of this Court's Opinion and Order incorrectly stated that the remaining claim against De La Rosa and Lara were excessive force in violation of the *Eighth* Amendment. However, the remaining claims are actually claims of excessive force in violation of the *Fourth* Amendment, as explained in the body of the Opinion and Order. *See id.* at pp. 8–12.
[16] Dkt. No. 13.
[17] Dkt. No. 24; *see also* Dkt. Nos. 21 & 23 (extending deadline to file dispositive motions).
[18] Dkt. No. 29. Plaintiff concedes that summary judgment should be granted as to De La Rosa. *Id.* at p. 1 n. 1.
[19] Dkt. No. 31.
[20] Dkt. No. 32.
[21] Dkt. No. 32-1.
[22] Dkt. No. 27.
[23] Dkt. No. 28.
[24] Dkt. No. 27.
[25] Dkt. No. 24-14.

Plaintiff argues Rodriguez's testimony has been previously struck by federal courts and therefore has a history of being found to lack credibility.[26] Plaintiff also argues the testimony of Rodriguez should be stricken because Rodriguez testified on matters upon which he is not an expert and because Rodriguez testified on matters not helpful or relevant to the jury.[27] Specifically, Plaintiff argues Rodriguez is not qualified to testify: (1) about memory and witness perception theories; (2) about airbags; (3) as a legal expert; and (4) about issues that are not relevant or helpful to the jury.

Defendants object to Plaintiff's reference to decisions by other federal courts to exclude Rodriguez's testimony.[28] In addition, Defendants respond to each of Plaintiff's requests to strike and argue why each should not be stricken.[29]

The Court, after considering the motion, **GRANTS IN PART** and **DENIES IN PART** Plaintiff's motion, as described in its reasoning below. The Court will first consider Defendants' objection to Plaintiff's reliance on prior judgments making rulings on the reliability and credibility of Rodriguez's testimony, and then consider each of the portions of Rodriguez's testimony that Plaintiff requests to strike.

*a. Previous Cases and Newspaper Article*

Plaintiff argues the Court should rely on determinations in prior cases where Rodriguez's "qualifications and integrity have been questioned," and attaches these rulings to his motion.[30]

---

[26] *See* Dkt. Nos. 27-1 (order in *Ibarra v. Harris County,* No. 4:04-cv-186, Dkt. No. 245 (S.D. Tex. Mar. 2, 2005)) & 27-3 (order in *Amin-Akbari v. The City of Austin, Texas,* No. 1:13-cv-472-DAE (W.D. Tex. Jan. 7, 2015). Plaintiff also attaches a news article discussing Rodriguez's testimony as an expert in other cases in Texas. *See* Dkt. No. 27-2.

[27] Dkt. No. 27 p. 4, 7.

[28] Dkt. No. 28 p. 3.

[29] *Id.* at pp. 8–13.0

[30] Dkt. No. 27 p. 1; *see* Dkt. No. 27-1, Dkt. No. 27-3.

Plaintiff also attaches a newspaper article purporting to show Rodriguez's "reputation and improprieties" based on reporting relating to cases in which Rodriguez has testified.[31]

Defendants object to Plaintiff's arguments relying on previous cases in which Rodriguez's testimony was stricken because "it serves no purpose in support of the arguments [Plaintiff] makes" and instead, "is being used as an attempt to influence the Court . . . as to Mr. Rodriguez's truthfulness, credibility, and trustworthiness."[32] Defendants argue for similar reasons that Plaintiff's reliance on a newspaper article detailing Mr. Rodriguez's history as a witness is improper.[33]

Judicial findings in other cases are generally inadmissable hearsay.[34] However, a trial judge may consider hearsay evidence in assessing an expert's reliability.[35] After a witness has been repeatedly rejected by courts it is appropriate to take judicial notice of this history of other courts finding the witnessed lacked credibility.[36] Additionally, a court may take judicial notice of newspaper articles to demonstrate that certain facts were generally known within the court's jurisdiction, but not the truth of the facts reported in the newspaper article.[37]

Here, the cases and the newspaper article cited by Plaintiff do not establish a pattern of courts finding Rodriguez lacking credibility. The cases share no factual or legal similarities, either to each other or this case; the grounds upon which each judge made determinations as to

---

[31] *Id.* at p. 2.

[32] Dkt. No. 28 p. 3, ¶ 4.

[33] *Id.* at p. 4, ¶ 6.

[34] *See Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris, Inc.*, 141 F. Supp. 2d 320, 323 (E.D.N.Y. 2001) (citing McCormick on Evidence § 318, at p. 894 (3d ed. 1984)).

[35] Fed. R. Evid. 104(a).

[36] *See Blue Cross & Blue Shield of N.J.*, 141 F. Supp. 2d at 324 (collecting cases).

[37] *See* Fed. R. Evid. 201(b) ("A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."); *see also Associated Gen. Contractors of Am. v. City of Columbus*, 936 F. Supp. 1363, 1425 (S.D. Ohio 1996) (discussing when a court may judicially notice facts reported in a newspaper article).

Rodriguez's testimony are completely different, and none are at issue here.[38] Therefore, these orders do not establish a pattern of Rodriguez exhibiting improper behavior in court or being found to lack credibility. The mere fact that two prior judges determined in the unique circumstances in those cases to limit or strike Rodriguez's testimony is insufficient to prohibit Rodriguez from testifying in this case.

Additionally, the newspaper article also provides no support for finding any pattern of Rodriguez lacking credibility. Indeed, the article is an opinion piece, and thus not a proper basis for establishing any fact-pattern.[39] The Court must take judicial notice only of the fact that a newspaper article was published regarding Rodriguez in the Texas Observer in 2017, and thus this article was known to the public, but the Court may not rely upon the content of the article for the truth of those facts.[40]

Accordingly, the Court does not rely upon the two prior cases or the newspaper article in reaching its determinations about the relevance or reliability of Rodriguez's testimony. With this basis the Court now turns to the substance of Plaintiff's requests to strike Rodriguez's testimony.

b. *Psychology Testimony*

Plaintiff argues that Rodriguez is not an expert in psychology and requests that the Court strike paragraphs 66–70 and the last sentence of paragraph 106.[41] Each of these includes opinion testimony by Rodriguez about how memory is impacted by a traumatic incident and each is based on Rodriguez's training and certification by the Force Science Institute.[42]

---

[38] *Compare* Dkt. No. 27-1 (basing a sanctions order on Rodriguez improperly communicating with witnesses), *with* Dkt. No. 27-3 (limiting the scope of Rodriguez's testimony in certain respects, each ruling carefully tailored to the facts of that case and sharing no similarities to any issue raised by Plaintiff).

[39] Dkt. No. 27-2.

[40] *See* Fed. R. Evid. 201(b).

[41] Dkt. No. 27 p. 5.

[42] *See* Dkt. No. 24-14 pp. 25–26, ¶¶ 66–70, p. 41, ¶ 106.

Rodriguez attended and received a certification from the "Force Science Institute."[43] Defendants assert that the Force Science Institute "trains investigators on how to analyze officer performance under stress, action/reaction time, memory, and decision making . . . during dangerous encounters, including an officer involved shooting."[44] Defendants cite to www.forcescience.org in support of this contention.[45]

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony and reports.[46] An expert witness may testify in the form of an opinion if the expert is qualified as an expert by "knowledge, skill, experience, training, or education;" and (a) the expert's knowledge will help the trier of fact; (b) the testimony is based on sufficient facts; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.[47]

The Supreme Court, in analyzing Rule 702, has indicated that the overarching concern is whether the testimony is relevant and reliable.[48] A district court has broad discretion in deciding the admissibility of expert testimony.[49] The burden is on the party offering the expert testimony to demonstrate that the expert's findings are reliable.[50]

To be reliable, expert testimony must "be grounded in the methods and procedures of science and . . . be more than unsupported speculation or subjective belief."[51] Further, courts should refuse to allow an expert witness to testify if it finds that the witness is not qualified to

---

[43] *Id* at p. 50.
[44] Dkt. No. 28 p. 8,
[45] *Id.*
[46] Fed. R. Evid. 702.
[47] *Id.*
[48] *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993).
[49] *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004)
[50] *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 276 (5th Cir. 1998).
[51] *Johnson v. Arkema, Inc.*, 685 F.3d 452, 459 (5th Cir. 2012) (internal citation omitted).

testify in a particular field or on a given subject.[52] The party seeking to demonstrate that an expert is reliable must demonstrate "objective, independent validation of the expert's methodology."[53]

The Court concludes Defendants have not met their burden to demonstrate Rodriguez is a qualified expert in psychology or that Rodriguez utilizes reliable methods. Defendants provide no information about the Force Science Institute beyond the main website page, and provide no information about Rodriguez's specific certification. Nor do Defendants provide any "objective, independent validation of the expert's methodology" of the techniques relied upon by the Force Science Institute in general or in the specific certification course completed by Rodriguez.[54] Accordingly, the Court **GRANTS** Plaintiff's motion in relation to paragraphs 66–70 and the last sentence of paragraph 106 and **STRIKES** this portion of Rodriguez's testimony from the record.

### c. Airbag Testimony

Plaintiff argues Rodriguez is not an expert in airbags and requests to strike the last three sentences of paragraph 94 and the first two sentences of paragraph 95 from Rodriguez's testimony.[55] In these statements Rodriguez provides opinions about impact of airbag deployment and the length of time it takes for an airbag to deflate.[56]

Defendants indicate that Rodriguez is basing his opinion regarding airbags on his experiences as a State Trooper and in-service trainings regarding collision investigation and reconstruction that Rodriguez received.[57] Rodriguez asserts he is qualified as a "Collision

---

[52] *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999).
[53] *Moore*, 151 F.3d at 276.
[54] *See id.*
[55] Dkt. No. 27 p. 6.
[56] Dkt. No. 24-14 p. 36 ¶¶ 94–95.
[57] Dkt. No. 28 p. 9, ¶ 15, Dkt. No. 28-2 p. 6, ¶ 8.

Investigation and Reconstruction" expert, and that through his "training, experience and research" he has "become familiar with motor vehicle airbag deployments and deflations."[58]

The Court finds these assertions do not meet Defendants' burden to demonstrate that Rodriguez is a qualified expert about airbags. Defendants do not include information about the methods are utilized by Rodriguez as a Collision Investigation and Reconstruction expert or why these methods are reliable. The Court concludes Defendants have not met their burden and thus **GRANTS** Plaintiff's motion and **STRIKES** the last three sentences of paragraph 94 and the first two sentences of paragraph 95 of Rodriguez's testimony from the record.

### d. Legal Testimony

Plaintiff argues Rodriguez is not a legal expert and requests to strike paragraphs 30, 34, 35, 42, 43, 45, 46, 47, 61, 62, 63, 78, 79, 81, 86, 87, 89, 90, 98, 99, 101, 102, 103, 104, 109, 111, 122, and 123.[59] Plaintiff argues that in each of these Rodriguez offers legal opinions.[60] Defendant responds that Rodriguez instead offers opinions about the trainings that "peace officers licensed in the State of Texas and for law enforcement trainers."[61]

In general, expert testimony is not allowed regarding the law, and experts may not "state a legal conclusion."[62] An expert's legal conclusion "both invades the court's province and is irrelevant."[63] Thus, pursuant to Federal Rule of Evidence 702, courts generally exclude expert testimony stating legal conclusions.

After reviewing each paragraph Plaintiff requests to strike, the Court grants a portion of Plaintiff's requests. To the extent Rodriguez provides a legal determination evaluating the facts

---

[58] Dkt. No. 28-2 p. 6, ¶ 8.
[59] Dkt. No. 27 p. 6.
[60] *Id.*
[61] Dkt. No. 28 p. 10, ¶ 16.
[62] *Tex. Peace Officers Ass'n v. City of Dall.*, No. 94-10769, 1995 U.S. App. LEXIS 42798, at *2 (5th Cir. May 31, 1995).
[63] *Owen v. Kerr-McGee Corp.*, 698 F.2d 236, 240 (5th Cir. 1983).

of this case under Supreme Court law, such testimony is inadmissible for summary judgment purposes. Accordingly, the Court **GRANTS** Plaintiff's motion in relation to paragraphs 78, 79, 87, 89, 90, 98, 101, 111, and 122; and to the extent that a legal opinion is given, **STRIKES** each of these paragraphs from consideration in the summary judgment context.

However, upon review, many of the paragraphs are not legal analysis, but instead consist of Rodriguez's opinion about law enforcement trainings based on legal standards. Defendants point to Rodriguez's extensive experience providing trainings based on Supreme Court decisions as required by the Texas Law Enforcement Commission as evidence of his qualification as an expert in this area.[64] Given that this case is based on the subjective understanding of law enforcement officers regarding the appropriate use of force, Rodriguez's testimony regarding how law enforcement officers are trained about appropriate behavior in light of Supreme Court cases is admissible. Thus, the Court **DENIES** Plaintiff's motion in relation to paragraphs 30, 34, 35, 42, 43, 45, 46, 47, 61, 62, 63, 81, 86, 99, 102, 103, 104, 109, and 123.

### e. Irrelevant Testimony

Plaintiff argues that Rodriguez draws "conclusions about the evidence that are not specific to the training of law enforcement officers."[65] Plaintiff argues these are not relevant to a trier of fact and requests to strike paragraphs 53; 62; 64 (last two sentences); 65 (last two sentences); 71 (last two sentences); 74 (last two sentences); 75 (last sentence); and 82 (last sentence).[66]

Defendants argue each of these pertain to how police officers are trained and thus would be useful to a trier of fact. In assessing relevance, courts should consider whether the expert's

---

[64] *See id.*; Dkt. No. 28-2, p 5, ¶¶ 5–6
[65] Dkt. No. 27 p. 7.
[66] *Id.*

opinion will assist the trier of fact.[67] Relevant testimony must "fit[]" the facts of the case and thereby assist the trier of fact to understand the evidence.[68]

The Court agrees with Defendants that Rodriguez's testimony in the sections highlighted by Plaintiff are relevant. Each of the highlighted sections contains Rodriguez's opinion about the reasonability of the officers' actions in light of their law enforcement training, and thus would assist the trier of fact in determining the subjective reasonableness of the law enforcement officers in choosing to utilizing force. Accordingly, the Court **DENIES** Plaintiff's motion in relation to paragraphs 53; 62; 64 (last two sentences); 65 (last two sentences); 71 (last two sentences); 74 (last two sentences); 75 (last sentence); and 82 (last sentence).

Based the on the foregoing the Court **DENIES IN PART AND GRANTS IN PART** Plaintiff's motion to partially strike Rodriguez's testimony in the manner already explained. The Court now turns to Plaintiff's motion for leave to file a sur-reply.

### III.    MOTION FOR LEAVE TO FILE SUR-REPLY

Before turning to the motion for summary judgment, the Court first considers Plaintiff's motion to file a sur-reply.[69] Although the motion is styled as "opposed" Defendants have not responded. Thus, the motion is unopposed by under Local Rules.[70] Plaintiff requests to file a sur-reply to respond to new evidence in Defendants' response,[71] and attaches a proposed sur-reply.[72]

The Court finds the sur-reply responds to Defendants' response and the sur-reply will not delay the proceeding.[73] Given that Defendants are unopposed to Plaintiff's motion, the Court determines Plaintiff has provided cause to consider the sur-reply. Accordingly, the Court

---

[67] *See Peters v. Five Star Marine Serv.*, 898 F.2d 448, 449 (5th Cir. 1990) (citing Fed. R. Evid. 702 advisory committee's notes (1972)).
[68] *See Daubert*, 509 U.S. at 591.
[69] Dkt. No. 32.
[70] *See* L. R. 7.4 of the United States District Court of the Southern District of Texas.
[71] *See* Dkt. Nos. 31, 31-1, 31-2.
[72] Dkt. No. 32-1.
[73] *See* Dkt. No. 32.

**GRANTS** Plaintiff's motion to file a sur-reply and will consider the substance of Plaintiff's sur-reply in the Court's analysis of Defendants' motion for summary judgment.

## IV. SUMMARY JUDGMENT MOTION

### a. Legal Standard

Under Rule 56, summary judgment is proper when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[74] In a motion for summary judgment, the movant bears the initial burden of showing the absence of a genuine issue of material fact.[75] The burden then shifts to the non-movant to demonstrate the existence of a genuine issue of material fact.[76] "A fact is 'material' if its resolution could affect the outcome of the action,"[77] while a "genuine" dispute is present "only if a reasonable jury could return a verdict for the non-movant."[78] As a result, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."[79]

In conducting its analysis, the Court considers evidence from the entire record and views that evidence in the light most favorable to the non-movant.[80] Rather than combing through the record on its own, the Court looks to the motion for summary judgment and response to present the evidence for consideration.[81] Parties may cite to any part of the record, or bring evidence in

---

[74] Fed. R. Civ. P. 56(a).
[75] *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).
[76] *See id.* at 323.
[77] *Burrell v. Dr. Pepper/Seven UP Bottling Grp.*, Inc., 482 F.3d 408, 411 (5th Cir. 2007) (internal quotation marks and citation omitted).
[78] *Fordoche, Inc. v. Texaco, Inc.*, 463 F.3d 388, 392 (5th Cir. 2006) (citation omitted).
[79] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).
[80] *See Moore v. Willis Indep. Sch. Dist.*, 233 F.3d 871, 874 (5th Cir. 2000) (citations omitted).
[81] *See* Fed. R. Civ. P. 56(e).

the motion and response.[82] By either method, parties need not proffer evidence in a form admissible at trial,[83] but must proffer evidence substantively admissible at trial.[84]

### b. Evidentiary Issues

Plaintiff and Defendants also raise other issues with the evidence relied upon by the opposing party. Thus, before providing a full summary of the facts in the record, the Court considers these issues.

### i. Sandra Netherton Testimony

Defendants object to Plaintiff's referring to the deposition testimony of a witness to the incident, Sandra Netherton ("Netherton"), because Plaintiff did not submit Netherton's deposition into the record.[85] However, Defendants attached Netherton's deposition testimony to their response, and thus submitted Netherton's deposition in the record.[86] While the Court would never consider evidence not in the record, because Defendants have placed Ms. Netherton's testimony in the record, the Court will consider it.

### ii. Texas Ranger Investigation

Plaintiff complains that Texas Department of Public Safety Investigation ("Investigation"), submitted into evidence by Defendants, showed biased and was incomplete.[87] Plaintiff disputes no factual assertion made by Defendants that relies on the Investigation, and instead argues that different versions of the Investigation do not contain the same information.[88]

---

[82] *See* Fed. R. Civ. P. 56(c).
[83] *See Celotex Corp.*, 477 U.S. at 324 ("We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment.").
[84] *See Bellard v. Gautreaux*, 675 F.3d 454, 460 (5th Cir. 2012) ("[T]he evidence proffered by the plaintiff to satisfy his burden of proof must be competent and admissible at trial.").
[85] *See* Dkt. No. 31.
[86] *See* Dkt. No. 31-1
[87] Dkt. No. 29 p. 5.
[88] *Id.*

The Investigation was an independent assessment of the shooting completed by Texas Ranger Robert Callaway ("Ranger Callaway") shortly after the incident at the request of the Mission Police Department.[89] The Investigation was completed in the days following the incident and included testimony and witness statements from police officers, bystanders, and experts.[90] After completion, the Investigation was submitted to the Hidalgo County District Attorney's Office in connection with the criminal investigation into the shooting.[91]

The Court finds Plaintiff's complaints are immaterial to this motion. First, Plaintiff does not indicate what relief, if any, he would like due to the alleged bias of the Investigation. Plaintiff does not request the Investigation be excluded from the record. Indeed, Plaintiff cites extensively to the deposition testimony of Ranger Callaway which relies on the results of the Investigation.[92] Second, even assuming the truth of Plaintiff's allegation that Ranger Callaway omitted some information from the final version of the Investigation, this does not mean that any of the facts included in Ranger Callaway's report are incorrect. For the foregoing reasons, the Court disregards Plaintiff's arguments about the alleged bias of the Investigation.

### iii. Plaintiff's Unsupported Factual Assertions

Defendants argue that Plaintiff makes factual allegations and assertions in his response that are unsupported by any evidence.[93] Plaintiff responds that much of his response included citations to the record.[94]

Any assertion or allegation unsupported by evidence cannot be used to establish a genuine dispute of a material fact. Rule 56(c)(1) provides that the party asserting that a fact

---

[89] *See* Dkt. No. 24-4 Robert Callaway Deposition (hereinafter "Callaway Deposition") 9:10–20 39:1–3, 53:12–13, 68:16–18; *see also* Dkt. No. 25 (Investigation).
[90] *See* Dkt. No. 25.
[91] Dkt. No. 24 p. 9, ¶ 10.
[92] *See, e.g.,* Dkt. No. 29 pp. 8–9.
[93] Dkt. No. 31 p. 2, ¶ 2.
[94] *See* Dkt. No. 32-1.

cannot be or is genuinely disputed *must* support the assertion by citing to "particular parts of materials" in the record or showing that the materials cited do not establish the absence or presence of a genuine dispute.[95] The burden imposed by Rule 56(c)(1) on the nonmoving party is not heavy, however "the bare assertion that there are material facts in dispute is obviously not sufficient to carry this burden."[96] Further, "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment."[97]

Upon review, although Plaintiff does cite to evidence in some portions of his response, much of Plaintiff's response contains factual allegations and assertions with no citation to the record.[98] To the extent that Plaintiff makes factual assertions or argues there are disputes regarding the factual evidence without citing to evidence in support, the Court disregards these assertions.[99]

### iv. Plaintiff's Misleading or Inaccurate Citations

Defendants also argue that Plaintiff's response is replete with inaccurate or misleading factual assertions that are not supported by the evidence.[100] The Court again agrees. Plaintiff makes numerous factual assertions that are misleading, inaccurate, or—on several occasions—where the cited evidence actually states the *opposite* of Plaintiff's contention. The Court now turns to one such example: Plaintiff's reference to the apparent testimony of Donna Lytle.[101]

---

[95] Fed. R. Civ. P. 56(c)(1) (emphasis added).
[96] *United States v. Ledesma*, 33 F. Supp. 3d 734, 742 (S.D. Tex. 2012)
[97] *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998); *see also Nissho-Iwai American Corp. v. Kline*, 845 F.2d 1300, 1307 (5th Cir. 1988) (it is not necessary "that the entire record in the case . . . be searched and found bereft of a genuine issue of material fact before summary judgment may be properly entered").
[98] *See, e.g.*, Dkt. No. 29 p. 4 (Plaintiff's factual assertions contain no citation to the record).
[99] *Ragas*, 136 F.3d at 458.
[100] *See e.g.*, Dkt. No. 31 p. 5.
[101] *See* Dkt. No. 29 p. 6.

### 1. *Donna Lytle*

Plaintiff argues testimony from Donna Lytle, a purported witness to portions of the incident, disagrees with other witness testimony.[102] Plaintiff does not submit into evidence any testimony of Donna Lytle. Instead, Plaintiff cites to the deposition testimony of Ranger Callaway, in which Ranger Callaway is asked to comment on a video clip of testimony from Donna Lytle.[103]

The Court finds Donna Lytle's testimony as cited by Plaintiff is inappropriate summary judgment evidence. Plaintiff cited Ranger Callaway to support the truth of Donna Lytle's version of events.[104] However, Ranger Callaway actually states that he is *skeptical* of the accuracy of Donna Lytle's testimony because it conflicts with video evidence.[105] In sum, Plaintiff is citing to deposition testimony in which the deposed individual *disagrees* with the statement of a third party to support the truth of the assertion of the third party. Thus, Plaintiff's citation to Ranger Callaway's deposition in support of Donna Lytle's version of events is—at best—inaccurate, and—at worst—could indicate a deliberate attempt to mislead the Court. Additionally, even if the factual assertion were accurate, Ranger Callaway repeating a third-party statement is clearly hearsay not within any exception, and, therefore, inadmissible.[106] Accordingly, to the extent Plaintiff cites to Donna Lytle's version of events, the Court disregards these assertions.

### 2. *Admonishment*

As noted, Plaintiff's response is replete with similarly misleading and inaccurate citations. The Court declines to examine every one of these, except as noted later in this Opinion

---

[102] *Id.*
[103] *See id.* nn.26–27 (citing Dkt. No. 29-4 253:10–254:4). The Court notes Plaintiff incorrectly cites to "Exhibit D, Cabrera Deposition," but Plaintiff's Exhibit D is, in actuality, the deposition of Officer Callaway.
[104] *See* Dkt. No. 29 p. 2 nn.12–13
[105] *See* Dkt. No. 29-4 254:6–256:7.
[106] Fed. R. Evid. 801(c), 802, 803.

to address necessary arguments. However, the Court admonishes to Plaintiff remember the requirement to only make factual allegations that Plaintiff reasonably believes are supported by evidence.[107] The Court now turns to the factual backgrounds as established by the evidence in the record.

### b. *Factual Background*

#### i. **Initial Encounter**

On February 22, 2016, Mission Police Department officers responded to a domestic disturbance in a small retirement community named "Wagon City South," located in Mission, Texas, where Plaintiff lived with his son, Decedent.[108] Decedent had a long history of mental illness, suffering from bipolar disorder and schizophrenia.[109] On that day, Plaintiff called 911 to report that he had been assaulted at his home by Decedent.[110] Plaintiff told the 911 operator that Decedent had threatened to kill Plaintiff with an ax, and was outside Plaintiff's house hitting Plaintiff's truck and motorcycle with the ax.[111] Plaintiff also informed the 911 operator that Decedent was schizophrenic and was off his medication.[112]

Cabrera was on patrol and Dispatch informed Cabrera there was a schizophrenic male subject, off his medication and armed with an ax, who had assaulted his elderly father.[113] Cabrera headed towards the address provided.[114] Before Cabrera arrived, Dispatch informed him

---

[107] Fed. R. Civ. P. 11(b)(3).

[108] Dkt. No. 24-3 Javier Lara Deposition (hereinafter "Lara Deposition") 7:16–18.

[109] Dkt. No. 29 Plaintiff Deposition 20:23–24, 35:14–15.

[110] Dkt. No. 24-1 Audio Recording of 911 Call made by Plaintiff on February 22, 2016 (hereinafter "Plaintiff 911 Call") time stamp 00.00–00.15; Dkt. No. 24-5 Plaintiff Dep. 56:1–58:7.

[111] Dkt. 24-1 Plaintiff 911 Call time stamp 00.15–1:40; *see also* Dkt. No. 24-5 Plaintiff Dep. 58:8–22.

[112] Dkt. 24-1 Plaintiff 911 Call time stamp 00.15–1:40. Plaintiff later testified Decedent had been off his medication for several days before the incident. Dkt. No. 24-5 Plaintiff Dep. 54:2–17.

[113] Dkt. No. 24-2 Dispatch Audio of February 22, 2016 time stamp 00.00–00.54

[114] Dkt. No. 24-6 Interview of Jorge Cabrera on February 24, 2016 (hereinafter "Cabrera Interview") 8:17–23.

Decedent had put down the ax and picked up a machete.[115] Cabrera arrived at the home by himself.[116]

Cabrera exited his vehicle, unholstered his weapon and started walking towards Decedent.[117] Cabrera testified he saw Decedent with a machete in his right hand and gave Decedent verbal commands to stop, put his hands up, and drop his weapon,[118] and told Decedent, "Please put it [the machete] down. I don't want to shoot you."[119] Cabrera testified Decedent "just threw it [the machete] to the floor and ran towards his truck . . . I think it was an F-250."[120]

As Decedent got into the truck, Cabrera called Dispatch, saying "this guy's about to take off."[121] Decedent entered the truck and Cabrera commanded Decedent to "get out" multiple times.[122] Cabrera testified that Decedent did not comply and instead drove the truck towards Cabrera.[123] Footage from Cabrera's 'dash cam' shows Cabrera running backwards as a red truck drives directly at Cabrera.[124]

Cabrera testified he "thought [Decedent] was going to run over me."[125] Cabrera fired a single shot at Decedent.[126] Cabrera fell to the ground, narrowly missed—or perhaps side-

---

[115] Dkt. No. 24-2 Dispatch Audio of February 22, 2016 time stamp 02.15–02.54; Dkt. No. 24-6 Cabrera Interview 9:5–8; Dkt. No. 25 p. 19, ¶ 7.3; *see also* Dkt. No. 24-7 Video Record of Police Unit 272 Dash Cam Footage of Officer Jorge Cabrera (hereinafter "Cabrera Dash Cam") time stamp 13:44:10–13:44:42.

[116] Dkt. No. 25 p. 19, ¶ 7.3; Dkt. No. 24-6 Cabrera Interview 8:18–9:18.

[117] Dkt. No. 24-6 Cabrera Interview 9:20–10:14.

[118] *Id.* 14:5–18; *see also* Dkt. No. 24-7 Cabrera Dash Cam time stamp 13:44:40–13:44:52 (Officer Cabrera can be heard, off camera, saying "hands up" several times).

[119] Dkt. No. 24-6 Cabrera Interview 10:22–23; *see also* Dkt. No. 29-2 Jorge Cabrera Deposition (hereinafter "Cabrera Deposition") 31:15–17.

[120] Dkt. No. 24-6 Cabrera Interview 10:24–11:1.

[121] Dkt. No. 24-6 Cabrera Interview 11:9–13; *see also* Dkt. No. 24-7 Cabrera Dash Cam time stamp 13:45:08–13:45:16 (Officer Cabrera can be heard, again off camera, relaying what is presumably the license plate of the truck).

[122] Dkt. No. 24-6 Cabrera Interview 12:1–6.

[123] *Id.* 12:4–14; Dkt. No. 24-1 Plaintiff 911 Call time stamp 4:35–4:55.

[124] Dkt. No. 24-7 Cabrera Dash Cam time stamp 13:45:13–13:45:17.

[125] Dkt. No. 24-6 Cabrera Interview 16:2–3.

[126] *Id.* 12:1–15; Dkt. No. 24-7 Cabrera Dash Cam time stamp 13:45:13–13:45:16 (a single shot is clearly audible).

swiped—by the truck.[127] Cabrera quickly got to his feet and fired three more shots at the truck before the truck drove off.[128] Cabrera returned to his vehicle, informed Dispatch, "shots fired" and began pursuit of Decedent.[129] Throughout the pursuit Cabrera was the police unit directly behind Decedent.[130]

### ii. Vehicle Pursuit

Other Mission Police Department officers began to arrive at Wagon City South, including Defendant Lara.[131] At this time Dispatch relayed, "shots fired" and "officer down."[132] Lara testified that when he heard "shots fired" and "officer down" he believed Cabrera had been killed.[133] Lara entered Wagon City South and followed a police unit in pursuit of Decedent.[134] This unit was driven by Cabrera, although Lara testified he did not know this at the time.[135]

Shortly after entering Wagon City South, Lara turned down a small street, encountering Decedent driving towards Lara's vehicle head-on.[136] Decedent crashed into the front right quadrant of Lara's vehicle.[137] Lara testified he thought Decedent intentionally hit his vehicle.[138]

---

[127] Cabrera later testified that he felt pain later in the afternoon, but was uncertain if he was actually struck by the truck. *See* Dkt. No. 29-3 Cabrera Dep. 38:12–14.

[128] Dkt. No. 24-7 Cabrera Dash Cam time stamp 13:45:16–13:45:26; Dkt. No. 29-3 Cabrera Dep. 39:9–40:18. During this encounter Plaintiff had remained on the phone with 911 and continued to communicate what he observed transpire between Cabrera and Decedent; Plaintiff told the 911 operator that Decedent had hit Cabrera with the truck and that there was an "officer down" and "shots fired." Dkt. No. 24-1 Plaintiff 911 Call time stamp 4:35–4:55.

[129] Dkt. No. 24-6 Cabrera Interview 18:14–17; Dkt. No. 24-8 Cabrera Dep. 41:15–23.

[130] Dkt. No. 29-3 Cabrera Dep. 83:6–10; *see also* Cabrera Dash Cam time stamp 13:45:26–13:50:00.

[131] Dkt. No. 29-3 Lara Dep. 12:23–13:2; Dkt. No. 24-9 S Sean De La Rosa Deposition (hereinafter "De La Rosa Deposition")

[132] Dkt. No. 24-2 Dispatch Audio of February 22, 2016 time stamp 6:18–6:30; Dkt. No. 24-3 Lara Dep. 12:23–13:2; Dkt. No. 24-9 De La Rosa Dep. 6:22–7:3, 24:20.

[133] Dkt. No. 24-3 Lara Dep. 13:6–9, 14:16–19.

[134]*Id.* 25:6–9; *see also* Dkt. No. 24-7 Video Record of Police Unit 281 Dash Cam Footage of Officer Javier Lara (hereinafter "Lara Dash Cam") time stamp 13:45:22–13:46:02.

[135] *See* Dkt. No. 24-3 Lara Dep. 32:3–6.

[136] Dkt. No. 24-7 Lara Dash Cam time stamp 13:46:36–40; *see also* Dkt. No. 24-3 Lara Dep. 25:10–13.

[137] Lara's dash cam shows the red truck driving directly at Lara's vehicle, before swerving to the right and crashing into Lara's vehicle on the right front quadrant. Dkt. No. 24-7 Lara Dash Cam time stamp 13:46:38–42; Dkt. No. 29-8; Dkt. No. 29-9. *see also* Dkt. No. 24-3 Lara Dep. 25:14–20.

[138] Dkt. No. 24-3 Lara Dep. 25:12–26:16.

Lara also testified he believed his unit was disabled by the impact.[139] Lara exited his vehicle and drew his handgun, but did not fire as Decedent drove past.[140]

Lara then retrieved his rifle from his vehicle and waited for Decedent to return to this area of Wagon City South.[141] Wagon City South has only one entry and exit, and the road where Lara positioned himself is near that entry point.[142] Lara testified he ordered bystanders in the area to "get out of harm's way."[143]

Meanwhile, Decedent's vehicle was not impaired by the impact; Cabrera, De La Rosa, and other police units continued the pursuit in a high-speed chase through the streets of Wagon City South.[144] De La Rosa was the vehicle behind Cabrera and was calling out locations and directions during the pursuit.[145] Cabrera testified he believed Decedent was going "above sixty" miles per hour.[146] During the pursuit, Decedent nearly struck an individual in the roadway.[147] Lara testified he heard over the radio that Decedent had nearly hit a pedestrian.[148]

### iii. The Crash and Rifle Shot

After a high-speed pursuit through the streets of Wagon City South, Decedent returned to where Lara had positioned himself in the road.[149] Lara yelled out commands for the truck to stop

---

[139] *Id.* 27:8–10.

[140] *Id.* 31:5–8, 40:16–18; *see also* Dkt. No. 24-7 Cabrera Dash Cam time stamp 13:46:48–13:46:55.

[141] Dkt. No. 24-3 Lara Dep. 40:22–41:3.

[142] *See* Dkt. No. 24-7 Lara Dash Cam; Dkt. No. 24-10 Gary Rinehart Dep. 10:8–15, 18:15–19, Dkt. No. 29-1 Lara Dep. 22:23–25.

[143] Dkt. No. 24-3 Lara Dep. 46:1–4.

[144] Dkt. No. 24-7 Cabrera Dash Cam time stamp 13:46:40–13:49:05, Video Record of Police Unit 281 Dash Cam Footage of Officer Sean De La Rosa (hereinafter "De La Rosa Dash Cam") time stamp 13:46:13–13:19:17.

[145] *See* Dkt. No. 29-5 De La Rosa Dep. 30:6–9, 100:14–17; *see also* Dkt. No. 24-7 De La Rosa Dash Cam time stamp 13:46:22–13:49:56.

[146] Dkt. No. 24-6 Cabrera Interview 37:11–15; *see* Dkt. No. 24-7 Cabrera Dash Cam (the dash cam record shows Cabrera going in excess of fifty-five miles per hour and Decedent is well ahead of Cabrera throughout the pursuit).

[147] Dkt. No. 24-7 Cabrera Dash Cam time stamp 13:48:15–13:48–22; Dkt. No. 24-6 Cabrera Interview 23:15–20; Dkt. No. 24-8 Cabrera Dep. 70:17–25.

[148] Dkt. No. 24-3 Lara Dep. 54:11–15.

[149] *Id.* 51:23–52:1; Dkt. No. 24-7 Lara Dash Cam time stamp 13:48:58–13:49:01; *see also* Dkt. No. 24-7 Cabrera Dash Cam time stamp 13:48:55–13:49:07.

as it approached his position in the road.[150] Lara testified, "the truck stopped, revved his engine, moved forward, stopped again, revved its engine a second time, then moved forward again."[151]

The record clearly reflects that two events happened next, but the exact sequence of events is unclear: (1) Lara fired a single shot from his rifle that went through the windshield of the truck;[152] and (2) the truck crashed into a tree in a yard between two neighboring trailer homes and came to a stop.[153]

From the record it is unclear the length of time between Lara's shot and the crash. Lara initially testified he shot prior to the crash,[154] but after reviewing the video evidence, Lara later conceded that the sound of his gun shot occurred "after [Decedent] hit the tree."[155] In dash cam videos a shot can be heard, either simultaneous to the truck striking the tree or in the moment before or after.[156]

It is also unclear exactly where Lara was standing when he fired the rifle. Lara initially testified he was standing in the road when he fired the rifle shot,[157] but later in his deposition, after reviewing Cabrera's dash cam video, agreed that it appeared he was standing "by the tree" and not "in the street."[158] The footage from Cabrera's dash cam shows the truck strike the tree, but Lara's exact location is unclear because he is obscured by a white truck parked in the

---

[150] *See* Dkt. No. 24-3 Lara Dep. 51:23–54:18.
[151] *Id.* 56:21–25; *see also* Dkt. No. 24-7 Lara Dash Cam time stamp 13:48:57–13:49:05 (Lara's dash cam video corroborates this testimony and shows the truck abruptly halting, and then driving forward, out of sight of the video); *see also* Cabrera Dash Cam time stamp 13:48:58–13:49:02.
[152] Dkt. No. 24-3 Lara Dep. 51:23–53:17.
[153] Dkt. No. 24-7 Cabrera Dash Cam time stamp 13:48:58–13:49:02; *see also* Lara Dash Cam time stamp 13:49:01–13:49:07.
[154] *See* Dkt. No. 24-3 Lara Dep. 53:9–13.
[155] *Id.* 94:9.
[156] Dkt. No. 24-7 Cabrera Dash Cam time stamp 13:49:02–13:49:07, Lara Dash Cam time stamp 13:49:04–13:49:09.
[157] Dkt. No. 29-1 Lara Dep. 56:6–10.
[158] *Id.* 93:7–10.

street.[159] Regardless of the timing of the shot and Lara's location, Plaintiff's expert consultant testified the rifle round did not strike Decedent.[160]

### iv. Shots After Crash

After the crash, events happened very quickly. As the truck crashed, there were numerous members of the Wagon City South in the area, including Shirley Netherton standing in her front yard as the truck crashed.[161] The front of the truck was damaged from the crash and the horn was blaring.[162]

Lara, De La Rosa, Cabrera, and other officers approached the truck with their weapons out,[163] and about ten seconds after the crash there was a series of gun shots, which lasted approximately thirteen seconds[164] Following the shooting, there was a brief interval.[165] Then the truck rolled slowly backwards, away from the tree and into the side of Netherton's trailer home.[166] Almost instantaneous with the truck rolling backwards, there was a final shot.[167] According to dash cam footage, the entire incident—from the crash to the final shot—took approximately fifty seconds.[168] Decedent was removed from the truck, unresponsive, and was pronounced dead.[169]

The record includes testimony, photographs, and videos showing multiple angles and viewpoints of these concurrent events. In the interest of clarity, the Court now separately

---

[159] Dkt. No. 24-7 Cabrera Dash Cam time stamp 13:49:04–13:49:07.
[160] Dkt. No. 24-9 Jeffrey J. Noble Deposition (hereinafter "Noble Deposition") 118:2–5.
[161] Dkt. No. 24-7 Cabrera Dash Cam time stamp 13:49:02 (shows Netherton moving out of the way of truck); *see also* Dkt. No. 24-3 Lara Dep. 46:23–25, 49:2–15.
[162] *see* Dkt. No. 29-6 (photograph of truck after the crash showing damage to the front); Dkt. No. 29-7 (same); Dkt. No. 24-7 Cabrera Dash Cam time stamp 13:48:55–13:50:07.
[163] Dkt. No. 24-7 Cabrera Dash Cam time stamp 13:49:05–13:50:00; Lara Dash Cam time stamp 13:49:07–13:50:02.
[164] *See* Dkt. No. 24-7 Cabrera Dash Cam time stamp 13:49:13–13:49:26.
[165] *Id.* time stamp 13:49:27–13:49:54.
[166] Dkt. No. 24-7 Cabrera Dash Cam time stamp 13:49:54–13:49:59 (truck rolls away slowly from the tree); Dkt. No. 31-1 Netherton Dep. 33:22–25.
[167] Dkt. No. 24-7 Cabrera Dash Cam time stamp 13:49:59–13:50:01 (final shot heard very shortly after truck rolls away from the tree).
[168] Dkt. No. 24-7 Cabrera Dash Cam time stamp 13:49:05–13:50:00; Lara Dash Cam time stamp 13:49:07–13:50:02.
[169] Dkt. No. 24-9 De La Rosa Dep. 207:21–22.

explains the actions of Lara, De La Rosa, and Decedent in these moments as established by the evidence.

### 1. Lara's Actions

Immediately after the crash but before shots other than the rifle shot were fired, Lara advanced on the truck, and as Lara approached, his rifle jammed, and he switched to his handgun.[170] Lara testified he saw "heavy damage" to the front of the truck.[171] As Lara approached he gave Decedent multiple commands to "get out of the vehicle."[172]

Although Lara did not observe Decedent with any weapons, Lara testified he saw Decedent moving inside the truck, ignoring all commands, and revving the engine.[173] In particular, Lara testified he saw Decedent attempting to place the truck into reverse.[174] Lara testified, "[a]t that time when [Decedent] hit the tree, he was trying to dislodge the truck from the tree by putting it in reverse and trying to dislodge it."[175]

As Lara neared the passenger side window, Lara fired at Decedent a total of four times with his handgun.[176] On Lara's and Cabrera's dash cam videos, the first shot from the handgun can be heard about ten seconds after the truck crashed into the tree,[177] and the shots occurred at

---

[170] Dkt. No. 24-3 Lara Dep. 60:15–19; Dkt. No. 29-3 Cabrera Dep. 106:4–107:16.

[171] Dkt. No. 29-1 Lara Dep. 63:11.

[172] Dkt. No. 24-7 Video Record of Police Unit 267 Dash Cam Footage time stamp 13:49:00–13:50:34; Dkt. No. 24-3 Lara Dep. 74:14–18; Dkt. No. 24-6 Cabrera Interview 25:5–6; Dkt. No. 24-10 Gary Rinehart Deposition 20:22, 22:1.

[173] Dkt. No. 24-3 Lara Dep. 62:11, 74:14–75:2, 79:16–84:3; *see also* Dkt. No. 29-3 Cabrera Dep. 121:16–19 (testifying Decedent had no other visible weapons besides the truck); Dkt. No. 24-10 Rinehart Dep. 20:22–23 (testifying Decedent "at no time" gave "any kind of indication of submission" in response to Lara's commands).

[174] *See* Dkt. No. 24-3 Lara Dep. 62:11, 74:14–75:2, 79:16–84.

[175] *Id*. 61:16–19.

[176] *Id*. 80:1–3. Although the parties do not dispute the number of shots fired by Lara, the Court notes it is unclear from the audio in the dash cam videos the exact number of shots fired and by whom. *See* Dkt. No. 24-7 Cabrera Dash Cam time stamp 13:48:55–13:49:33. Cabrera and Lara both testified they fired shots during this time period, however, Cabrera testified he did not shoot at Decedent. *See* Dkt. No. 24-8 Cabrera Dep. 108:2–3. The parties do not dispute that only shots fired by Lara struck and injured Decedent and that Decedent was struck by four shots.

[177] *See* Dkt. No. 24-7 Cabrera Dash Cam time stamp 13:49:03–13:49:13, Lara Dash Cam time stamp 13:49:07–13:49:16.

intervals for approximately thirteen seconds.[178] Lara testified he stopped to reassess the situation after each shot.[179] Lara described the shooting as follows:

> [W]hen I fired the first round, the glass [of the passenger side window] shattered. When I fired the second round, [Decedent] reacted to the rounds—to the rounds hitting him. He was still trying to dislodge the truck. The third round he was still trying to dislodge the truck. He was still messing with the gears; just showing that he was still trying to get away. And the fourth round hit him in the neck, so that's what made him stop.[180]

Lara testified he "kept on shooting until [Decedent] stopped messing with the truck. During the whole course of my actions, he kept trying to dislodge the truck from the—from the tree."[181]

### 2. De La Rosa's Actions

Concurrent to Lara's actions, De La Rosa approached the truck after it hit the tree and saw an elderly woman, Netherton, in the yard near the truck.[182] De La Rose testified his first action was to "yell[] commands at [Netherton] to move out of the way."[183] Once De La Rose believed Netherton was "out of the way," the initial shots were over and De La Rosa moved to the driver's side of the truck to check on Decedent.[184] De La Rosa testified that by this time Decedent "wasn't responsive," even though the truck was still "revving and moving."[185]

De La Rosa then used a "glass puncturing device" to strike the window of the truck and hit it "several" times.[186] After De La Rosa struck the window, the truck rolled backwards until it collided with the edge of Netherton's trailer home a few feet behind where the truck had

---

[178] Dkt. No. 24-7 Cabrera Dash Cam time stamp 13:49:03–13:49:26, Lara Dash Cam time stamp 13:49:16—13:49:29. Additionally, the Court notes that this series of shots also included shots fired by Cabrera, although Cabrera testified that he did not shoot at Decedent. *See* Dkt. No. 24-8 Cabrera Dep. 108:2–3.

[179] Dkt. No. 24-3 Lara Dep. 80:1–6; *see also* Dkt. No. 24-7 Cabrera Dash Cam time stamp 13:48:55–13:50:07.

[180] Dkt. No. 24-3 Lara Dep. 80:19–81:1.

[181] *Id.* 80:1–13.

[182] Dkt. No. 24-9 De La Rosa Dep. 165:23–166:1; Dkt. No. 31-1 Netherton Dep. 10:1–3; *see also* Dkt. No. 24-7 Cabrera Dash Cam time stamp 13:48:55–13:49:03 (Netherton can be seen near the tree as the truck strikes it).

[183] Dkt. No. 24-9 De La Rosa Dep. 141:2; Dkt. No. 31-1 Netherton Dep. 10:6–7.

[184] Dkt. No. 24-9 De La Rosa Dep. 173:8–13.

[185] *Id.* 175:6–20.

[186] *Id.* 176:13–180:5; Dkt. No. 31-1 Netherton Dep. 10:10–11.

crashed.[187] After the truck started rolling backwards, De La Rosa testified he "shot through the window into the dashboard" so he "could open the door."[188] De La Rosa testified he did not shoot at Decedent,[189] and expert analysis indicates this round did not strike Decedent.[190] De La Rosa then opened the driver side door and removed Decedent, who was unresponsive, from the vehicle.[191]

### 3. Decedent's Actions

Several witnesses testified regarding Decedent's actions immediately after the crash and the shooting. Given that Decedent's actions are key to determining whether Defendants may have been justified in the use of force, the Court will consider this witness testimony in detail.

Gary Rinehart ("Rinehart") was in the community clubhouse across the street during the shooting, and testified he had a clear view of the truck and Decedent during the entire incident from inside the clubhouse.[192] Rinehart testified that shortly after the crash, he heard officers give Decedent commands, and in response Decedent moved in a manner consistent with putting the truck in reverse, and after a delay of a second or two seconds, Rinehart heard a shot.[193] Rinehart believed this shot was fired from a "pistol."[194] Rinehart testified that Decedent was still moving and non-compliant after the first shot,[195] and that he observed Decedent attempting to "put[] the

---

[187] Dkt. No. 24-9 De La Rosa Dep. 180:4–184:12; *see also* Dkt. No. 24-7 Cabrera Dash Cam time stamp 13:49:54–13:49:59 (the truck slowly rolling backwards way from the tree).
[188] Dkt. No. 24-9 De La Rosa Dep. 187:9–10; Dkt. No. 24-7 Cabrera Dash Cam time stamp 13:49:55–13:50:00 (a single gunshot can be heard almost immediately after the truck rolls backward).
[189] Dkt. No. 24-9 De La Rosa Dep. 187:12–13.
[190] Dkt. No. 24-15 Noble Dep. 142:14–17, 149:6–9.
[191] Dkt. No. 24-9 De La Rosa Dep. 197:17–207:23; *see also* Dkt. No. 31-1 Netherton Dep. 10:10–13.
[192] Dkt. No. 24-10 Gary Rinehart Deposition (hereinafter "Rinehart Deposition") 14:5–20, 26:9, 33:17.
[193] *Id.* 56:20–58:14, 63:15–64:6.
[194] *Id.* 61:12–15.
[195] *Id.* 23:10–14, 26:2–4, 56:19–20.

car into reverse and attempting to flee."[196] Further Rinehart testified "at no time did [Decedent] give any kind of indication of submission."[197]

Both officers provide similar testimony. Cabrera testified he could see Decedent inside the truck throughout the shooting.[198] Cabrera testified he and Lara gave Decedent commands to "stop" and "get out" and that Decedent was "still trying to put [the truck] in reverse" despite the commands.[199] Lara testified he approached the truck from the passenger side and that he could see Decedent in the vehicle.[200] Lara testified Decedent "was trying to dislodge the truck from the tree by putting it in reverse."[201] Lara testified that Decedent continued these actions despite Lara's commands for Decedent to stop, and that Decedent continued moving and attempting to reverse the truck until Decedent was incapacitated by Lara's final shot.[202]

Netherton, the elderly woman in the yard as Decedent crashed, testified regarding her view of the crash and shooting. However, it is unclear from the record where Netherton was positioned during the incident, how much of the incident she viewed, and whether she was able to witness Decedent's actions inside the truck.

Netherton was in her front yard at the moment the truck crashed into the tree,[203] but, at some point after the truck crashed, went into her house and then came back outside.[204] Netherton's testimony of her movements during the incident is as follows:

> I was standing in my front yard, and a truck came through my front yard and hit my neighbor's tree . . . And then these policemen were shooting at this man, and I

---

[196] *Id.* 58:14.
[197] *Id.* 20:22–23.
[198] *See* Dkt. No. 24-8 Cabrera Dep. 101:2–106:2, 120:7–12.
[199] Dkt. No. 24-6 Cabrera Interview 25:1–13; *see also* Dkt. No. 24-8 Cabrera Dep. 121:11, 128:18–20.
[200] Dkt. No. 24-3 Lara Dep. 59:23–60:2.
[201] *Id.* 61:16–19.
[202] *Id.* 80:14–81:1.
[203] *See* Dkt. No. 24-7 Cabrera Dash Cam time stamp 13:49:02 (showing Netherton moving out of the way of truck); Dkt. No. 24-9 De La Rosa Dep. 166:24–167:1 (testifying he saw Netherton in the "hot zone" of the incident).
[204] Dkt. No. 31-1 Netherton Dep.10:5–9, 39:21–40:9; *see also* Dkt. No. 24-9 De La Rosa Dep. 140:2–141:9, 166:4–5, 167:2–7.

went out. And anyways, [the police officers] told me to go in the house. I went in the house, and I went out the back door to see what they were doing to him and they were shooting . . . And then this—this one policeman came around and broke the window and shot him.[205]

A photograph taken at some point during the shooting[206] shows Netherton on her back porch, about thirty feet behind the truck according to Netherton's estimate.[207] The record is unclear how long Netherton remained at each position.

Netherton testified she saw Decedent's movements in the truck after the crash, but her testimony does not indicate when she saw these actions or where she was standing. Netherton's deposition testimony contains the following exchange regarding Decedent's actions in the truck:

> Q: After the truck hit the tree, could you—could you see whether the driver was doing anything inside the truck?
> Netherton: Wasn't doing anything.
> Q: Was just sitting there?
> Netherton: Uh-huh. I think he was already gone . . . That's what I think.
> Q: Okay So you saw . . . the truck hit the tree, and you could see that the driver wasn't doing anything?
> Netherton: No.
> Q: But the police officers continued to shoot at him?
> Netherton: Yes . . . Because he slowly—he slowly went back into my house. He didn't drive back there or anything. It just, like, crept back and hit my house. I think he was already gone.[208]

Although nothing in Netherton's deposition testimony indicates which portion of the incident this is in reference to or from what vantage point Netherton viewed Decedent's actions, the truck rolling backwards occurred near the end of the incident, after Lara had stopped shooting.[209]

Regardless of where and when Netherton viewed Decedent's actions, Netherton's testimony contains conflicting information regarding whether she was able to see Decedent's actions while he was inside the truck. At the beginning of her deposition Netherton affirmatively

---

[205] Dkt. No. 31-1 Netherton Dep. 10:1–11.
[206] It is unclear from the record exactly when the photograph was taken. *See infra* Part IV.Section vi.2 n.249.
[207] *See* Dkt. No. 31-2 (photograph); Dkt No. 31-1 Netherton Dep. 40:9–10.
[208] Dkt. No. 31-1 Netherton Dep.16:1–20.
[209] Dkt. No. 24-7 Cabrera Dash Cam time stamp 13:49:54–13:49:59.

responded to a question asking if she could "see whether the driver was doing anything inside the truck."[210] However, later Netherton stated, "I didn't see inside the truck."[211] Additionally, Netherton conceded she could not view Decedent's actions inside the truck while she was on the porch.[212] Finally, Netherton's deposition testimony included the following exchange:

> Q: Okay. Ms. Netherton, you testified earlier already that it was clear from your vantage point at some point in time during the incident you couldn't see exactly what the driver was doing inside the vehicle.
> Netherton: No, I couldn't.
> Q. Okay. All right. So, it is possible—even though you said in some of your statements that [Decedent] wasn't doing anything, it's possible that he was. You just couldn't see. . . .
> Netherton: What could he do? . . .
> Q: My question is you didn't see everything from your vantage point.
> Netherton: Not what's [] inside the truck.[213]

Thus, it is unclear whether Netherton was able—at any time—to see inside the truck.

### v. After the Shooting

Dr. Norma Jean Farley, M.D., performed the autopsy on Decedent.[214] The autopsy reported that Decedent sustained four gunshot wounds and that he died of gunshot wounds to his neck and torso.[215] The autopsy also revealed that Decedent tested positive for cannabinoids and fentanyl/metabolites.[216]

The Mission Police Department Office of Professional Responsibility conducted an administrative review of the incident and found Cabrera, De La Rosa, and Lara "did not violate any rules and policies from the City of Mission or the Mission Police Department."[217] The Mission Police Department also brought in Ranger Callaway to conduct an outside investigation,

---

[210] Dkt. No. 31-1 Netherton Dep. 16:1–4.
[211] *Id.* 35:3.
[212] Dkt. No. 31-1 Netherton Dep. 41:17–19.
[213] *Id.* 46:9–47:1.
[214] *See* Dkt. No. 24-11 (Autopsy Report).
[215] *Id.*
[216] *Id.*
[217] Dkt. No. 24-12 p. 10.

and Ranger Callaway submitted the Investigation to the Hidalgo County District Attorney's Office.[218] On March 7, 2017, the Grand Jury for the 139th Judicial District Court returned a No Bill for the offense of Manslaughter as to Cabrera, De La Rosa, and Lara.[219]

### vi. Factual Disputes

Plaintiff contends that several issues constitute factual disputes. The Court will briefly consider Plaintiff's contentions before turning to its legal analysis.

#### 1. Initial Rifle Shot

Plaintiff argues there is a dispute of fact regarding whether the initial rifle round shot by Lara struck Decedent. Plaintiff states, "[a]lthough [Officer Callaway] testified that he did not believe this first shot through the windshield, hit [Decedent], he was not sure because it is next to impossible to recreate bullet trajectories for vehicles."[220] In support of this assertion Plaintiff cites testimony by Ranger Callaway.[221] The Court finds Plaintiff's factual assertion is not supported by the cited evidence.

At no point did Ranger Callaway indicate he was 'unsure' of his conclusion that the rifle bullet did not hit Decedent. Instead, Ranger Callaway testified he believed the rifle shot through the windshield did not hit Decedent.[222] The portion of the deposition cited by Plaintiff concerns another analysis technique involving "trajectory rods," which can determine the trajectory of a shot.[223] In discussing the trajectory rod analysis of this shooting, Ranger Callaway indicated that because the officers and the vehicle were moving, it would be "very difficult to get an accurate representation of where the shot originated."[224] Even given this limited analysis, Ranger

---

[218] *See* Dkt. No. 24-4 Robert Callaway Deposition 9:10–20; 39:1–3, 53:12–13, 68:16–18; *see also* Dkt. No. 25.
[219] *See* Dkt. No. 24-13.
[220] Dkt. No 29 pp. 8–9 (citing Dkt. No. 29-4 134:23–25, 140:10–141:13) (quotations omitted).
[221] *Id.* at p. 8 (citing Dkt. No. 29-4 Callaway Dep. 182:4–14).
[222] Dkt. No. 29-4 Callaway Dep. 134:23-25.
[223] *See id.* 136:18–137:22.
[224] *Id.* 137:12–13.

Callaway did not "believe it [the rifle bullet] struck Decedent," and instead "believe[d] it lodged itself in the back corner of the vehicle."[225] However, Ranger Callaway could not "confirm" this analysis because "everything move[d]."[226]

Being unable to definitely confirm a conclusion through a specific test does not equate to a lack of confidence in the conclusion. The testimony cited by Plaintiff does not support that Ranger Callaway was "not sure," and instead shows Ranger Callaway maintaining his conclusion that the rifle bullet did not strike Decedent. Plaintiff's own expert consult agrees with Ranger Callaway's analysis that the rifle shot did not strike Decedent.[227] Thus, the Court concludes the evidence indicates the rifle shot through the windshield did not strike Decedent.

### 2. Netherton Testimony

Plaintiff argues Netherton "witnessed the entire incident"[228] and "testified that [Decedent] did not do anything inside the truck as Lara began shooting."[229] On this basis, Plaintiff asserts there is a factual dispute between Netherton's version of Decedent's actions and the witness testimony of Cabrera, Lara, and Rinehart.[230] The Court determines that the evidence does not support Plaintiff's characterization of Netherton's testimony, and that Netherton's testimony does not contradict the testimony of Cabrera, Lara, and Rinehart.

In a summary judgment motion, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence."[231] However, the court should also consider "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from

---

[225] *Id.* 140:7–9.
[226] Dkt. No. 29-4 Callaway Dep. 140:19–20.
[227] Dkt. No. 24-9 Noble Dep.118:2–5.
[228] Dkt. No. 29 p. 6.
[229] *Id.* at p. 9.
[230] *Id.* at pp. 16–17.
[231] *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000).

disinterested witnesses."[232] Additionally, the nonmoving party "cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or 'only a scintilla of evidence.'"[233] Merely because evidence in the record "does not contradict an offered theory does not mean that the theory can also be reasonably inferred from it."[234] Finally, because this motion for summary judgment concerns qualified immunity, the evidentiary burden is on Plaintiff to show Defendants are not entitled to qualified immunity.[235]

Here, drawing all reasonable inferences in favor of Plaintiff, the Court finds Netherton was not in a position to "witness the entire incident" as asserted by Plaintiff. Netherton testified she went in the house and then came back outside and viewed a portion of the incident while standing on her back porch,[236] and conceded she could not see Decedent's actions in the truck while she was on the porch.[237] Thus, even according to her own testimony, Netherton could not have witnessed the "entire incident."

Similarly, the record does not support Plaintiff's assertion that Netherton testified "[Decedent] did not do anything inside the truck as Lara began shooting." Although, Plaintiff does not specify which "shooting" he is referring to, the Court assumes Plaintiff is indicating Lara's handgun shots.[238] As the Court has already explained, Netherton's testimony does not clearly indicate when she was under the tree, when she was on her porch or what she saw while

---

[232] *Id.* (quotation omitted).

[233] *Turner v. Baylor Richardson Medical Center*, 476 F.3d 337, 343 (5th Cir. 2007) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

[234] *Hathaway v. Bazany*, 507 F.3d 312, 322 (5th Cir. 2007).

[235] *Id.* at 319.

[236] Dkt. No. 31-1 Netherton Dep. 10:5–9, 39:21–40:9; *see also* Dkt. No. 31-2 (photograph of Netherton on the porch).

[237] Dkt. No. 31-1 Netherton Dep. 35:3, 38:9–10, 46:11–12.

[238] *See* Dkt. No. 24-7 Cabrera Dash Cam time stamp 13:49:03–13:49:13. Lara's rifle shot occurred at the same moment the truck struck the tree and all of Netherton's testimony concerned "after the truck hit the tree." *See, e.g.,* Dkt. No. 31-1 Netherton Dep. 16:1–20.

in those locations. At best, Netherton's deposition testimony is ambiguous regarding whether she witnessed *any* of Decedent's actions in the truck.[239]

Even assuming Netherton was able to view Decedent's actions in the truck at some point, nowhere does Netherton state she witnessed Decedent's actions "as Lara began shooting." Plaintiff points to no portion of Netherton's deposition testimony that could support such. Plaintiff cites to the following portion of Netherton's deposition:

> Q: After the truck hit the tree, could you—could you see whether the driver was doing anything inside the truck?
> Netherton: Wasn't doing anything.[240]

This contains no reference to any specific period of time. However, when Netherton's deposition testimony is read in context, Netherton indicates that she believed Decedent "was already gone" at that moment,[241] and then refers to the truck rolling backwards, which occurred *after* Lara had stopped shooting.[242] Plaintiff additionally cites to testimony by Ranger Callaway who interviewed Netherton a few days after the incident.[243] However, Ranger Callaway testified that "[a]ll [Netherton] saw was how it ended."[244] Thus, none of the evidence cited by Plaintiff establishes that Netherton testified that Decedent "wasn't doing anything inside the truck as Lara began shooting" as Plaintiff asserts.

Plaintiff provides no timeline or analysis of any other evidence in the record to support Plaintiff's assertion that Netherton's testimony was in reference to the time "as Lara began

---

[239] *See* discussion *supra* Part IV.Section b.iv.3.

[240] *See* Dkt. No. 29 p. 9 (citing Netherton Dep. 16:1–4).

[241] Dkt. No. 31-1 Netherton Dep. 16:5.

[242] *See* Dkt. No. 31-1 Netherton Dep. 16:17–20; *see also* Dkt. No. 24-7 Cabrera Dash Cam time stamp 13:49:13–13:50:05.

[243] Dkt. No. 29 p. 6 (citing Dkt. No. 29-4 Callaway Dep. 259:23–260:9).

[244] Dkt. No. 29-4 Callaway Dep. 260:4–5. The Court notes the Ranger Callaway's testimony regarding Netherton's location during the shooting is hearsay. *See* Fed. R. Evid. 801(c). The Court cites to Ranger Callaway's testimony only to determine that Plaintiff has no support for his assertion.

shooting." The Court on its own considers the record and determines there is *no evidence* to support Plaintiff's claim that Netherton's testimony is in reference to "as Lara began shooting."

Netherton testified that after the crash she "went in the house," and when she came back outside the police officers "were shooting."[245] Thus, her testimony supports a reasonable inference that Netherton was testifying she came outside *during Lara's shots*. Additionally, Netherton's testimony does not contain any reference to seeing Lara shooting with a handgun. However Netherton does testify she witnessed events that occurred *after* Lara stopped shooting: the truck rolling backwards,[246] De La Rosa hitting the windshield of the truck,[247] and De La Rosa shooting the window of the truck.[248] Further, the photograph of Netherton shows Netherton on the porch sometime after Lara began shooting,[249] and De La Rosa testified that by the time Netherton was "out of the way," the initial shots were over.[250]

Accordingly, while this evidence does not definitely indicate that Netherton's testimony *could not* be in reference to Decedent's actions in the truck at the moment Lara began shooting, neither does the evidence provide any support for such a theory.[251] The Court finds Plaintiff's citation to Netherton's testimony is 'only a scintilla of evidence' and insufficient to meet Plaintiff's burden and defeat a motion for summary judgment.[252] Plaintiff, therefore, has not provided evidence sufficient to reasonably infer that Netherton's testimony was in reference to the moment Lara began shooting.

---

[245] Dkt. No. 31-1 Netherton Dep. 10:1–9.
[246] Dkt. No. 31-1 Netherton Dep. 16:17–20.
[247] *Id.* 16:21–25.
[248] *Id.* 39:4–5.
[249] *See* Dkt. No. 31-2. The photograph of Netherton on the porch does not have a time stamp. However, there are two indications of the time it was taken: (1) the passenger side window of the truck is broken; and (2) the truck is still stuck in the tree. This indicates that the photograph was taken *after* Lara's first shot, which shattered the passenger-side window of the truck *see* Dkt. No. 24-3 Lara Dep. 80:19–81:1, but *prior* to the truck rolling backwards, which occurred at the end of the incident. *See* Dkt. No. 24-7 Cabrera Dash Cam time stamp 13:49:54–13:49:59.
[250] Dkt. No. 24-9 De La Rosa Dep. 173:8–13.
[251] *Hathaway*, 507 F.3d at 322.
[252] *See Little*, 37 F.3d at 1075.

The Court now turns to the remaining testimony regarding Decedent's actions in the truck at the moment Lara began shooting. Although the Court must make all reasonable inferences in favor of Plaintiff, the Court must also consider evidence in favor of Defendants that is "uncontradicted and unimpeached," at least such evidence that comes from "disinterested witnesses."[253] Given that Plaintiff points to no evidence that Netherton was testifying she saw Decedent's actions in the truck as Lara began shooting, the Court must consider as uncontradicted the evidence of the other witnesses who testified as to Decedent's actions during that time.

Cabrera, Lara, and Rinehart each testified he was in a position to view the entire shooting, including as Lara began shooting,[254] and each testified that throughout the shooting Decedent attempted to place the truck in reverse, continued moving, and did not heed commands.[255] Even were the Court to disregard the testimony of Cabrera and Lara as interested witnesses, Rinehart, a community member, is disinterested, and corroborates the testimony of Lara and Cabrera.

Accordingly, the Court finds that Netherton's testimony does not indicate she was testifying regarding Decedent's actions at the moment Lara began shooting, and absent any contradicting evidence, the Court must consider the testimony of Cabrera, Lara, and Rinehart regarding Decedent's actions inside the truck as Lara began shooting. The evidence before the Court—and the lack of specific facts to the contrary—requires the Court to conclude Plaintiff has failed to contradict Defendants' evidence that Decedent was moving in the truck, attempting to

---

[253] *Reeves*, 530 U.S. at 150.
[254] *See* Dkt. No. 24-7 Cabrera Dash Cam time stamp 13:49:03–13:50:00; Dkt. No. 24-10 Rinehart Dep. 14:5–20.
[255] *See* Dkt. No. 24-3 Lara Dep. 80:14–81:1; Dkt. No. 24-6 Cabrera Interview 25:1–13; *see also* Dkt. No. 24-8 Cabrera Dep. 121:11, 128:18–20; Dkt. No. 24-10 Rinehart Dep. 9:16–23:20.

put the car in reverse, and failing to obey the officers' commands throughout the period Lara was firing his handgun.

### 3. *Lara's Credibility*

Plaintiff alleges there are discrepancies in Lara's testimony that indicate Lara's version of events are not credible. Namely, Plaintiff argues: (1) Lara did not command bystanders to get out of the way as he stated in his deposition testimony; (2) Lara did not fire his rifle in the street as Lara originally testified; and (3) Lara's unit was not disabled by the impact with Decedent's truck as Lara initially claimed.[256]

A motion for summary judgment cannot be defeated solely by "conclusional allegations that a witness lacks credibility."[257] Additionally, the "failure to remember certain details does not amount to a 'well-supported suspicion of mendacity' which is required to undermine an affiant's credibility.[258]

Plaintiff raises no issue that would undermine the credibility of Lara's testimony. That bystanders may not have heeded Lara's command to leave the area, or that other individuals may have been in the area who did not hear Lara's command, does not raise a reasonable inference that Lara did not give any commands or that Lara's testimony is lacking in credibility.

Plaintiff's next claim amounts to no more than that Lara's memory was imperfect. This does not raise "well-supported suspicion of mendacity."[259] Lara's position when he fired the rifle shot is unclear from the evidence in the record and his exact location when he fired the rifle is a

---

[256] *See* Dkt. No. 29 pp. 11–13.
[257] *Thomas v. Great Atlantic and Pacific Tea Co.*, 233 F.3d 326, 331 (5th Cir. 2000).
[258] *Hathaway*, 507 F.3d at 322.
[259] *Thomas*, 233 F.3d at 331.

matter of difference of, at most, a few seconds and a few feet.[260] That Lara may not have accurately remembered his location does not indicate any mendacity.

Finally, Plaintiff's claim that Lara stated in his deposition that his unit was not disabled by Decedent striking his vehicle is not supported by Lara's deposition testimony. Lara indicates he could reverse his vehicle by a short distance after the collision,[261] but the vehicle could not go more than "about a couple feet."[262] This does not indicate mendacity or in any way undermine Lara's credibility. Accordingly, the Court finds Plaintiff's arguments regarding Lara's credibility are unwarranted.

### 4. Lara's Perceptions

Plaintiff raises a number of issues regarding Lara's perceptions that Plaintiff contends raises disputes of fact, or again, serve to impeach Lara's credibility. Plaintiff argues that (1) Lara must have known Officer Cabrera had not been killed or injured;[263] (2) Lara could not have reasonably perceived his unit was intentionally struck by Decedent;[264] (3) Lara could not have reasonably perceived that his unit was disabled when Decedent struck it;[265] and (4) it was unreasonable for Lara to believe Decedent's truck was operable after the crash.[266]

The Court finds that none of these are disputes of fact, nor do they implicate Lara's credibility. Plaintiff provides no evidence that the events did not happen or that Lara did not perceive those events. Plaintiff does not dispute the "information available to" Lara.[267] Instead, Plaintiff makes arguments regarding what Lara *should have concluded* based on those events.

---

[260] *See* Dkt. No. 24-7 Cabrera Dash Cam time stamp 13:49:00–13:49:09.
[261] Dkt. No. 29-1 Lara Dep. 29:25–30:5.
[262] *Id.* 37:5–8.
[263] Dkt. No. 29 p. 11.
[264] *Id.*
[265] *Id.*
[266] *Id.* at p. 15.
[267] *See Glenn v. City of Tyler*, 242 F.3d 307, 312 (5th Cir. 2001).

However, as Plaintiff concedes, Lara's subjective intent and motivations are irrelevant.[268] At issue is whether Lara's *actions* were objectively reasonable in *light of the facts as Lara perceived them*, and the reasonableness of Lara's actions are a question of law.[269] Thus, the Court considers the reasonableness of Lara's actions in its legal analysis, to which it now turns.

### c.  Legal Analysis

This motion for summary judgment concerns Plaintiff's only remaining claims: Fourth Amendment excessive force claims brought under 42 U.S.C. § 1983 against De La Rosa and Lara. Defendants only challenge Plaintiff's claims on grounds that De La Rosa and Lara are entitled to qualified immunity.[270]

Because Defendants have invoked qualified immunity, the burden shifts to Plaintiff to show the defense is not available.[271] But where factual disputes exist, the Court accepts Plaintiff's version.[272] However, to overcome qualified immunity, Plaintiff bears the burden of negating the defense and "cannot rest on conclusory allegations and assertions but must demonstrate genuine issues of material fact regarding the reasonableness of the officer's conduct."[273] To meet his burden Plaintiff must show two things: (1) that the allegations make out a constitutional violation, and (2) that "the conduct was 'objectively unreasonable in light of clearly established law.'"[274]

---

[268] *Id.*
[269] *See Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007) ("At the summary judgment stage, however, once we have determined the relevant set of facts and drawn all inferences in favor of the nonmoving party to the extent supportable by the record . . . the reasonableness of [an officer's] actions . . . is a pure question of law.") (internal citations omitted).
[270] *See* Dkt. No. 24 pp. 11–24.
[271] *Kovacic v. Villarreal*, 628 F.3d 209, 211 (5th Cir. 2010).
[272] *Cooper v. Brown*, 844 F.3d 517, 522 (5th Cir. 2016).
[273] *Michalik v. Hermann*, 422 F.3d 252, 262 (5th Cir. 2005).
[274] *Carroll v. Ellington*, 800 F.3d 154, 169 (5th Cir. 2015) (quoting *Thompson v. Upshur Cnty., Tex.*, 245 F.3d 447, 457 (5th Cir. 2001)).

Courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."[275] Because Defendants do not challenge whether there is any constitutional violation, the Court will consider the second prong first: whether the conduct of De La Rosa and Lara was objectively unreasonable in light of clearly established law.

An officer is entitled to qualified immunity from a suit for damages if "a reasonable officer could have believed the actions to be lawful, in light of clearly established law and the information the officers possessed" at the time of the incident.[276] Even if enforcement officials err "they would be entitled to qualified immunity if their decision was reasonable, albeit mistaken."[277] "[Q]ualified immunity purposefully shields police officers' split-second decisions made without clear guidance from legal rulings."[278]

"The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."[279] This is an objective standard: "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."[280]

Potentially deadly force is objectively reasonable where the officer "has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others."[281] Whether the use of force was reasonable or excessive depends upon the totality of the circumstances, including: the severity of the crime, amount of force used contrasted with the

---

[275] *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).
[276] *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (quoting *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)).
[277] *Lampkin v. City of Nacogdoches*, 7 F.3d 430, 435 (5th Cir. 1993)
[278] *Pasco v. Knoblauch*, 566 F.3d 572, 582 (5th Cir. 2009).
[279] *Graham v. Connor*, 490 U.S. 386, 396 (1989).
[280] *Ramirez v. Knoulton*, 542 F.3d 124, 129 (5th Cir. 2008) (quoting *Graham*, 490 U.S. at 397).
[281] *Tennessee v. Garner*, 471 U.S. 1, 11 (1985).

amount of force needed, whether the suspect posed a safety risk to police or the public, and whether the suspect was actively resisting arrest or evading arrest by flight.[282] The court "must consider all of the circumstances leading up to [the moment deadly force is used], because they inform the reasonableness of [the officer's] decisionmaking."[283] "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."[284]

In the case of a suspect fleeing in a car, "the real inquiry is whether the fleeing suspect posed such a threat that the use of deadly force was justifiable."[285] In *Scott v. Harris*, the Supreme Court held that officers are not required to "allow fleeing suspects to get away whenever they drive so recklessly that they put other people's lives in danger" and may use deadly force to "terminate a dangerous high-speed car chase."[286] There, the use of force to stop a fleeing motorist was reasonable in part because the suspect posed "an actual and imminent threat to the lives of any pedestrians who might have been present, to other civilian motorists, and to the officers involved in the chase."[287] The Fifth Circuit has noted that the presence of "children or bystanders in the path of the vehicle" could indicate immediate danger.[288] Similarly, when judging whether deadly force was reasonable to stop a suspect fleeing in a car, courts have considered whether the suspect had already injured other officers or civilians with the vehicle.[289]

---

[282] *Bone v. Dunnaway*, 657 F. App'x 258 (5th Cir. 2016).
[283] *Mendez v. Poitevent*, 823 F.3d 326, 333 (5th Cir. 2016).
[284] *Graham*, 490 U.S. at 396–97.
[285] *Lytle*, 560 F.3d at 415.
[286] 550 U.S. at 385.
[287] *Id.* at 384.
[288] *Lytle*, 560 F.3d at 416.
[289] *See, e.g.*, *Waterman v. Batton*, 393 F.3d 471, 480 (4th Cir. 2005) (taking into consideration that officers believed suspect had just used a vehicle as a deadly weapon); *Scott v. Edinburg*, 346 F.3d 752 (7th Cir. 2003) (finding that an officer was justified in shooting at a fleeing suspect was justified because the suspect attempted to run over nearby bystanders).

In *Waterman v. Batton*, the Fourth Circuit considered whether officers were justified in firing at a suspect after a high speed chase, during which the suspect attempting to run officers off the road.[290] In *Waterman*, after the high speed chase, the suspect slowed down and officers positioned themselves in front of a toll booth and yelled at the suspect to stop.[291] The suspect accelerated to fifteen miles an hour and the officers opened fire even though the suspect was not driving directly at the officers.[292] The Fourth Circuit, considering the "split-second nature of the decision," determined the officers were justified in firing at the suspect because it was reasonable to believe the oncoming vehicle could turn and hit the officers and thus posed an immediate threat of serious physical harm.[293]

In order to justify potentially deadly force, the threat of physical harm must be "immediate."[294] Fifth Circuit case law "makes certain that once an arrestee stops resisting, the degree of force an officer can employ is reduced."[295] Further, "an exercise of force that is reasonable at one moment can become unreasonable in the next if the justification for the use of force has ceased."[296] In *Mason v. Lafayette City-Parish Consolidated Government,* the Fifth Circuit declined to provide qualified immunity to a police officer who fired two additional shots at a suspect after the suspect was already prone from prior gun shots because "a clearly incapacitated suspect" no longer poses an immediate threat of harm.[297] In *Lytle v. Bexar County,*

---

[290] 393 F.3d 471 (4th Cir. 2005).

[291] *Id.* at 474.

[292] *Id.*

[293] *Id.* at 478. The Fourth Circuit also found that subsequent shots, fired moments after the accelerating vehicle no longer posed a danger were not justified. However, the Fourth Circuit nonetheless concluded the officers were entitled to qualified immunity because the right was not clearly established. *See id.* at 480–483.

[294] *Garner*, 471 U.S. at 11.

[295] *Cooper*, 844 F.3d at 524; *see, e.g., Anderson v. McCaleb*, 480 F. App'x 768, 773 (5th Cir. 2012) (per curiam) (officer "should have known that he could not continue to shock [the suspect] with the taser after he was no longer resisting arrest").

[296] *Lytle v. Bexar Cty. Tex.*, 560 F.3d 404, 413 (5th Cir. 2009); *see also Ellis v. Wynalda*, 999 F.2d 243, 247 (7th Cir. 1993) ("When an officer faces a situation in which he could justifiably shoot, he does not retain the right to shoot at any time thereafter with impunity.").

[297] *Mason v. Lafayette City-Parish Consol. Gov't*, 806 F.3d 268, 278 (5th Cir. 2015).

*Texas*, the Fifth Circuit found a suspect fleeing in a car that "was three or four houses away" from the officer had ceased to pose an "immediate" danger and at that point deadly force was no longer justified.[298] However, in *Hathaway v. Bazany*, the Fifth Circuit found an officer was justified in firing at a suspect that drove at—and struck—an officer, even though the officer could not recall whether he fired "before, during, or immediately after" he was struck.[299] The Fifth Circuit reasoned, "[g]iven the extremely brief period of time an officer has to react to a perceived threat like this one, it is reasonable to do so with deadly force."[300]

When considering whether a suspect posed an immediate threat of harm, courts have also considered factors regarding how threatening a reasonable officer could perceive the suspect. Courts have found officers could reasonably believe the suspect poses a threat of immediate harm if the officer reasonably believed the suspect was reaching for a weapon.[301] Courts have found officers were justified in utilizing deadly force when they reasonably believed an object could have been a deadly weapon, even if the object, in fact, did not pose a risk of harm.[302] Additionally, courts consider whether the suspect ignored repeated officer demands when assessing whether a suspect would pose a threat to officers or the community.[303]

---

[298] *Lytle*, 560 F.3d at 413.

[299] 507 F.3d at 316.

[300] *Id.* at 322.

[301] *See, e.g.*, *Manis v. Lawson*, 585 F.3d 839, 844–845 (5th Cir. 2009) (officers justified in shooting a suspect that reached under his seat as if reaching for a weapon); *Ontiveros v. City of Rosenberg*, 564 F.3d 379, 385 (5th Cir. 2009) (suspect ignored officer's commands and suspect was shot when he reached into a boot for what the officer believed to be a weapon); *Reese v. Anderson*, 926 F.2d 494, 501 (5th Cir. 1991) (suspect repeatedly disobeyed officer's instructions to raise his hands, and was shot when he reached below the officer's line of sight); *Young v. City of Killeen, TX*, 775 F.2d 1349, 1352-53 (5th Cir. 1985) (suspect responded to the officer's order to step out of his car by reaching down to the floorboard and was shot).

[302] *See, e.g.*, *Grigsby v. Lawing*, No. 5:16CV16-RWS-CMC, 2017 U.S. Dist. LEXIS 219523, at *54 (E.D. Tex. Aug. 21, 2017) (finding it was reasonable for an officer to see "a shiny metal object" in the suspect's hand and believe it was a knife, when it was actually a spoon); *Reese*, 926 F.2d at 501 (police did not use excessive force where suspect repeatedly refused to keep hands raised and appeared to be reaching for an object, despite the "fact that [suspect] was actually unarmed"); *Young*, 775 F.2d at 1353 (use of deadly force permitted when suspect refused instructions to exit the vehicle and reached down to the floorboard despite being unarmed).

[303] *See, e.g.*, *Clayton v. Columbia Cas. Co.*, 547 F. App'x 645, 653 (5th Cir. 2013) (qualified immunity appropriate where "suspect with dangerous and violent propensities" "continued toward the Deputy, ignoring his commands"); *Manis*, 585 F.3d at 844 (5th Cir. 2009) (considering the fact that the suspect ignored repeated police commands");

A right is clearly established if a reasonable official would understand that what he is doing violates that right.[304] An official's actions are held to be reasonable unless "all reasonable officials" in the same circumstances would have known that the conduct violated the plaintiff's asserted rights.[305] The focus of the analysis is on whether an official had "fair notice" that the conduct was unreasonable and is judged against "the backdrop of the law at the time of the conduct."[306] The inquiry must be undertaken in light of "the specific context of the case, not as a broad general proposition."[307]

To find an official had fair notice "there must be a controlling authority—or a robust consensus of persuasive authority—that defines the contours of the right in question with a high degree of particularity."[308] The Fifth Circuit has noted that, "[e]xcessive force incidents are highly fact-specific and without cases squarely on point, officers receive the protection of qualified immunity."[309] However, "this does not mean that 'a case directly on point' is required."[310] Rather, "existing precedent must have placed the statutory or constitutional question 'beyond debate.'"[311] "The dispositive question is 'whether the violative nature of *particular* conduct is clearly established.'"[312]

---

*Ramirez*, 542 F.3d at 131 ("The totality of Ramirez's conduct could reasonably be interpreted as defiant and threatening. He repeatedly refused the officers' commands and ultimately stood, armed, several yards from the officers."); *Elliot v. Leavitt*, 99 F.3d 640, 643 (4th Cir. 1996) (officers justified in their use of force partially because they fired only after the suspect ignored orders to disarm).

[304] *Creighton*, 483 U.S. at 640.

[305] *Thompson v. Upshur County*, 245 F.3d 447, 457 (5th Cir. 2001).

[306] *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004).

[307] *Id.*

[308] *Morgan v. Swanson*, 659 F.3d 359, 371-72 (5th Cir. 2011) (en banc) (internal quotation marks and citation omitted).

[309] *Ontiveros*, 564 F.3d at 383 n.1 (5th Cir. 2009); *see also Creighton*, 483 U.S. at 638 ("[Q]ualified immunity protects all but the plainly incompetent or those who knowingly violate the law." (internal quotation omitted)).

[310] *Cooper*, 844 F.3d at 524 (quoting *Ashcroft v. al-Kidd,* 563 U.S. 731, 741 (2011)).

[311] *Id.*

[312] *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (emphasis in original) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)).

### i. De La Rosa

Plaintiff concedes that summary judgment should be granted as to De La Rosa.[313] The Court also finds that summary judgment is warranted. De La Rosa did not fire at Decedent, the evidence shows the one bullet he fired did not strike Decedent, and De La Rosa took no other action that could constitute excessive force. Accordingly, the Court **GRANTS** Defendants' motion for summary judgment in relation to De La Rosa, and Plaintiff's claims against De La Rosa are **DISMISSED WITH PREJUDICE**.

### ii. Lara

The Court now turns to whether Plaintiff, viewing the record in the light most favorable to the Plaintiff, has demonstrated that Lara's shots constituted an excessive force under the Fourth Amendment. Because the circumstances changed between Lara's rifle shot and the subsequent handgun shots, the Court will consider each action separately.

#### 1. Lara's Rifle Shot

Plaintiff does not meet the high burden of establishing Lara is not entitled to qualified immunity for his decision to fire the rifle at Decedent as Decedent drove in his direction. Plaintiff points to no case squarely on point, and no precedent that places the violation beyond debate.

The Court concludes Lara's decision to fire the rifle through the windshield of Decedent's truck could be objectively reasonable: Lara reasonably believed Decedent was a felon who was fleeing arrest, had already harmed or attempted to harm others, and was driving in the general direction of Lara and other bystanders. In such circumstances the use of deadly force may be objectively reasonable. However, the Court need not decide whether the rifle shot

---

constitutes excessive force, because case law does not establish that any violation was so clearly established that Lara would have fair notice that his action was objectively unreasonable.

Numerous courts have found that officers are justified in using potentially deadly harm against a suspect in a vehicle, where that vehicle could be used to cause immediate and serious harm, both to fellow officers and bystanders.[314] Indeed, the circumstances here remind the Court of *Scott*, where the suspect engaged in "a Hollywood-style car chase of the most frightening sort, placing police officers and innocent bystanders alike at great risk of serious injury."[315] Dash cam footage shows Decedent either hit or nearly hit Cabrera before driving the red truck through the narrow streets of the tightly-packed trailer homes of the retirement community at speeds in excess of fifty miles per hour.[316] As Decedent approached where Lara was positioned in the street, instead of surrendering to police, Decedent swerved and crashed into a tree while traveling at a "fast rate."[317] Thus, precedent indicates that Lara, like the officers in *Waterman*, could have reasonably perceived that in a split-second as Decedent drove in Lara's direction that Decedent could have turned the vehicle and struck an officer or a bystander.[318]

Additionally, Lara had credible information that Decedent had already used the truck as a weapon, and courts in similar circumstances have deemed the use of potentially deadly force reasonable in these circumstances.[319] Lara had heard over the radio "officer down" and credibly believed that Decedent had killed or gravely wounded an officer, regardless of whether it was officer Cabrera or another officer,[320] and had heard over Dispatch that Decedent had nearly

---

[314] *See, e.g., Scott*, 550 U.S. at 385; *Lytle*, 560 F.3d at 416.

[315] *Scott*, 550 U.S. at 380.

[316] *See generally* Dkt. No. 24-7 Cabrera Dash Cam.

[317] *See* Dkt. No. 24-7 Cabrera Dash Cam time stamp 13:49:00–13:49:05; Dkt. No. 24-10 Rinehart Dep. 19:1–5.

[318] *See Waterman*, 393 F.3d at 478.

[319] *See id* at 480; *Scott*, 346 F.3d at 752.

[320] Dkt. No. 24-3 Lara Dep. 13:1–2. Plaintiff argues it was unreasonable for Lara to believe that Decedent had injured an officer because Lara should have realized the unit in front of him was driven by Cabrera and therefore

struck a bystander with the truck moments before.[321] Lara had personally witnessed Decedent

ram Lara's vehicle, whether intentional or unintentional.[322] It is in these circumstances that Lara

fired a single rifle shot through the windshield of the truck. Plaintiff brings no case to show that

Lara's decision to fire at Decedent as Decedent drove rapidly in Lara's general direction to stop

Decedent from continuing to flee from police was not objectively reasonable.

Plaintiff argues that if the rifle shot occurred after the truck hit the tree Lara could no

longer have reasonably perceived Decedent to be a threat, and that Lara had fair notice that firing

on a suspect who was no longer a threat would be a constitutional violation.[323] However,

Plaintiff points to no precedent showing that the reasonableness of Lara's conduct could depend

on the split-second between Decedent driving at a fast rate in Lara's direction and Decedent's

flight being abruptly stopped by striking the tree. Lara fired nearly at the same instant the truck

hit the tree.[324] Like the officer in *Hathaway*, Lara had an "extremely brief period of time" to

react to Decedent's perceived threat.[325] Thus, case law indicates that in these circumstances

whether Lara fired the rifle a moment before or a moment after the truck crashed is irrelevant,

and Plaintiff brings no case law establishing otherwise.

Based on the foregoing, the Court finds that Plaintiff has pointed to no clearly established

legal principle supporting that Lara's decision to fire the rifle at Decedent as Decedent drove in

his direction was objectively unreasonable. The moments as Decedent drove at Lara were an

"evolving circumstance" where the Lara's split-second decision must be considered in light of

---

Cabrera was not injured. Dkt. No. 29 p. 11. However, Plaintiff does not dispute that Lara heard "officer down" from Dispatch. Thus, Lara's belief is credible even if Lara could have seen Cabrera.
[321] Dkt. No. 24-3 Lara Dep. 54:11–15.
[322] Dkt. No. 24-7 Lara Dash Cam time stamp 13:46:38–42; Dkt. No. 29-8; Dkt. No. 29-9. *see also* Dkt. No. 24-3 Lara Dep. 25:14–20.
[323] *See Cooper*, 844 F.3d at 524.
[324] Dkt. No. 24-7 Cabrera Dash Cam time stamp 13:49:02–13:49:07, Lara Dash Cam time stamp 13:49:04–13:49:09.
[325] *Hathaway*, 507 F.3d at 322.

the totality of the circumstances.[326] This is exactly the sort of decision that must be considered from the perspective of Lara at the scene and not reviewed with "20/20 hindsight,"[327] and where qualified immunity "purposefully shields police officers' split-second decisions."[328]

Thus, Lara is entitled to qualified immunity for the rifle shot that went through Decedent's windshield. The Court now turns to considering whether Plaintiff has met his burden of demonstrating the Lara's handgun shots violated clearly established law.

### 2. Lara's Handgun Shots

Plaintiff again does not meet the high burden of establishing Lara is not entitled to qualified immunity for the four handgun shots. Plaintiff points to no case squarely on point and no precedent that places the violation beyond debate.

As with the rifle shot, the Court determines Lara's decision to fire the four handgun shots also could be objectively reasonable. Although Lara faced a different set of circumstances, the information available to Lara regarding the potential threat posed by Decedent remained the same. Namely, Lara could reasonably perceive Decedent had recently attempted to harm officers and civilians with the truck. Thus, Lara could reasonably believe Decedent's attempts to place the truck in reverse posed a threat of immediate harm.[329] Therefore, Lara's decision to fire his handgun at Decedent as Decedent attempted to place the truck in reverse may be objectively reasonable. Again, the Court need not decide whether the handgun shots constitute excessive force, because case law does not establish that any violation was so clearly established that Lara would have fair notice that his action was objectively unreasonable.

---

[326] *Graham*, 490 U.S. at 396–97.
[327] *Id* at 396.
[328] *Pasco,* 566 F.3d at 582.
[329] *See, Garner*, 471 U.S. at 11; *Waterman*, 393 F.3d at 480; *Scott*, 346 F.3d at 752.

Plaintiff attempts to draw comparisons with M*ason v. Lafayette City-Parish Consolidated Government* and *Lytle v. Bexar County, Texas*.[330] Plaintiff argues Netherton's testimony establishes a dispute of fact regarding Decedent's actions at the time Lara fired.[331] The Court disagrees. As already explained, Netherton's testimony does not reference Decedent's actions at the time Lara began shooting. Instead, the Court must credit the uncontradicted, sworn testimony of Lara, Cabrera, and Rinehart as to Decedent's actions at that time. Thus, here, the facts are easily distinguishable from *Mason* and *Lytle*.

In *Mason*, an officer fired two shots at a suspect lying on the floor who had already been injured from a series of prior gun shots.[332] Here, unlike in *Mason*, Decedent was not incapacitated as Lara fired, but was ignoring all officer commands, actively attempting to put the truck into reverse, flee, and potentially use the truck as a weapon.[333] This case is further distinguished from *Mason* because Lara fired until Decedent stopped resisting and once Decedent no longer posed a threat after the fourth shot, Lara stopped firing.[334]

In *Lytle*, an officer fired at a suspect who was driving away from the officer and was "three or four houses" away by the time the officer fired.[335] Again, *Lytle* is distinguishable from the facts at issue. Lara was not facing a suspect who was fleeing and was no longer a threat, but instead a suspect who was in the immediate vicinity and who was attempting to dislodge a weapon—the truck. Thus, neither *Mason* nor *Lytle* suffice to meet Plaintiff's burden of demonstrating a case on point or a constitutional precedent that is beyond debate.

---

[330] *See* Dkt. No. 29.
[331] *See* Dkt. No. 32-1 p. 5.
[332] *Mason*, 806 F.3d at 278.
[333] Dkt. No. 24-3 Lara Dep. 80:14–81:1; Dkt. No. 24-8 Cabrera Dep. 121:11, 128:18–20; Dkt. No. 24-10 Rinehart Dep. 20:22–23, 56:19–58:14.
[334] Dkt. No. 24-3 Lara Dep. 80:14–81:1; *see also see* Dkt. No. 24-10 Rinehart Dep. 56:19–58:14.
[335] *Lytle*, 560 F.3d at 413.

Case law indicates that Lara would not have fair notice that his conduct violated a clearly established right. Courts have found that officers could reasonably perceive an immediate threat of harm when a suspect fails to follow commands,[336] and when a suspect reaches for something that an officer reasonably believes to be a weapon.[337] Such circumstances confronted Lara. Lara and Cabrera shouted commands at Decedent to stop moving or to get out of vehicle.[338] These commands were ignored and instead Decedent attempted to put the truck in reverse.[339] Plaintiff argues that Lara could not have reasonably believed the truck was a deadly weapon because it was damaged by the crash, and thus could have been inoperable.[340] However, courts have found that officers can reasonably believe an object could have been a deadly weapon, even if the object, in fact, did not pose a risk of harm.[341] This is analogous to the circumstances facing Lara. At the moment Decedent attempted to put the truck in reverse, Lara could reasonably have perceived the truck could be used as weapon, and he is protected from liability even if he was ultimately mistaken.[342]

In sum, after the crash Decedent had multiple chances to stop his attempts to flee, or to surrender himself, but instead Decedent attempted to put the truck in reverse. Lara then fired at Decedent to stop Decedent from potentially using the truck as a weapon and Lara ceased firing once Decedent stopped resisting.[343] Plaintiff has brought no case law to indicate Lara had fair notice that such conduct would violate a clearly established constitutional precedent.

---

[336] *See, e.g., Clayton*, 547 F. App'x at 653; *Manis*, 585 F.3d at 844; *Ramirez*, 542 F.3d at 131.

[337] *See, e.g., Manis*, 585 F.3d at 844–845; *Ontiveros*, 564 F.3d at 385; *Reese*, 926 F.2d at 501.

[338] *See* Dkt. No. 24-7 Video Record of Police Unit 267 Dash Cam Footage time stamp 13:49:00–13:50:34; Dkt. No. 24-3 Lara Dep. 74:14–18; Dkt. No. 24-6 Cabrera Interview 25:5–6; Dkt. No. 24-10 Rinehart Dep. 20:22, 22:1.

[339] Dkt. No. 24-3 Lara Dep. 80:14–81:1; Dkt. No. 24-8 Cabrera Dep. 121:11, 128:18–20, Dkt. No. 24-10 Rinehart Dep. 56:19–58:14.

[340] Dkt. No. 29 p. 15.

[341] *See, e.g., Reese*, 926 F.2d at 501; *Young*, 775 F.2d at 1353.

[342] *See Lampkin*, 7 F.3d at 435.

[343] Dkt. No. 24-3 Lara Dep. 80:14–81:1.

Accordingly, the Court finds Lara is entitled to qualified immunity. Based on the foregoing the Court, **GRANTS** Defendants' motion for summary judgment as to Lara and all Plaintiff's claims against Lara are **DISMISSED WITH PREJUDICE**.

## V.    INJUNCTIVE AND DECLARATORY RELIEF

Although not addressed by Defendants, Plaintiff also requested declaratory and injunctive relief in his complaint.[344] Plaintiff may not raise a claim for declarative or injunctive relief if he otherwise fails to establish success on the merits of his claims.[345] Plaintiff's claims have all been dismissed, thus injunctive relief or declaratory relief are not warranted here. Consequently, Plaintiff's request for injunctive and declarative relief is **DISMISSED WITH PREJUDICE**.

## VI.    HOLDING

Based on the foregoing, the Court **GRANTS** Defendants' motion for summary judgment.[346] Plaintiff's remaining claims against Lara and De La Rosa, and Plaintiff's entire complaint, are **DISMISSED WITH PREJUDICE.** Pursuant to Rule 58, a final judgment shall issue separately.

IT IS SO ORDERED.

DONE at McAllen, Texas, this 17th day of July, 2019.

_____
Micaela Alvarez
United States District Judge

---

[344] Dkt. No. 7 pp. 22–23, ¶¶ 76–77.

[345] Injunctive relief requires the movant to establish, among other things, that there is a substantial likelihood of success on the merits. *See Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011). Federal district courts in Texas have denied declaratory requests after determining that the substantive causes of action are meritless. *See e.g., Wigginton v. Bank of New York Mellon*, No. 3:10–CV–2128–G, 2011 WL 2669071, at *5 (N.D. Tex. July 7, 2011) (declining to consider a request for declaratory relief without a viable cause of action); *Broyles v. Chase Home Fin.*, 3:10-CV-2256-G, 2011 WL 1428904, at *5 (N.D. Tex. Apr. 13, 2011) (denying declaratory judgment request because substantive causes of action dismissed).

[346] Dkt. No. 24.